IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 4:18-cr-00086-DCC |
| | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| TASHAWN DAHEEM WILLIAMS, | ) | |
| _____ | ) | |

This matter is before the Court on Defendant's Motion to Suppress. ECF No. 43. The Government filed a Response. ECF No. 50. Accordingly, the Motion is ripe for consideration.

## BACKGROUND

On January 23, 2018, Defendant was indicted for numerous drug and firearm charges resulting from a traffic stop in Myrtle Beach, South Carolina. Defendant filed a Motion to Suppress the drugs and firearms seized during the traffic stop, and the Court held a suppression hearing on May 3, 2018.

At the suppression hearing, the Government offered the testimony of Officer Ed Gordon, a patrol officer with the Horry County Police Department with more than twenty-years of experience and extensive experience in drug investigations; Officer Gordon testified as follows. On the evening of Defendant's arrest, November 29, 2016, Officer Gordon was conducting surveillance of the Sea Mist Resort. On prior occasions, officers had observed street level drug deals at the Sea Mist Resort, which led to Officer Gordon's surveillance on the evening of Defendant's arrest. Officer Gordon positioned himself across the street from the Sea Mist Resort and observed what appeared to be hand-to-hand drug transactions. Specifically, Officer Gordon observed runners standing

1

outside of a hotel room.  These runners appeared to deliver drugs to pedestrians and individuals in vehicles who approached the Sea Mist Resort.  When Officer Gordon observed an alleged hand-to-hand drug transaction with an individual in a vehicle, he called out the identity of the vehicle to narcotics officers nearby in unmarked vehicles. Officers in the unmarked vehicles would follow the subjects until they committed a traffic violation, and then a marked unit would pull the subjects over.

After witnessing a number of these apparent hand-to-hand drug transactions, Officer Gordon observed Defendant appearing to emerge from the area of the room where the runners were standing and watched Defendant interact with the runners.  Additionally, Officer Gordon stated Defendant spoke with another man, but they walked out of Officer Gordon's line of sight.  The other man got into a red Cadillac while Defendant got into a white Audi; then, both men left the Sea Mist Resort.  Officer Gordon called out the identity of both vehicles and they were stopped by law enforcement.[1]  Officer Gordon testified that his familiarity with drug dealing in the Horry County area, combined with Defendant's actions, gave rise to a reasonable suspicion that Defendant was engaged in criminal activity.

On cross-examination, Officer Gordon admitted that he prepared no report on the evening of the arrest.  Officer Gordon also admitted that simply being in the proximity of drug transactions does not mean a person is involved in drug dealing.  Defendant introduced evidence that Defendant was a registered guest at the Sea Mist Resort on the evening of his arrest.  Accordingly, Defendant had a valid reason for being at the

_____

[1] The Government presented no evidence about the result of the traffic stop on the red Cadillac.

Sea Mist Resort; however, this information was not known by law enforcement on the evening of Defendant's arrest. Nevertheless, Officer Gordon testified that his opinion would not have changed even had he known Defendant was a registered guest.

The Government offered Corporal Justin Miller as its second witness. Corporal Miller conducted the traffic stop on the evening of the arrest and has been employed by the Horry County Police Department for fourteen years. Corporal Miller was assigned to the Street Crimes Unit on the evening of Defendant's arrest. Corporal Miller testified that Officer Gordon called out two vehicles—Defendant's Audi and a red Cadillac. An unmarked vehicle driven by another officer observed Defendant commit a traffic violation, and Corporal Miller then stopped Defendant's vehicle. Corporal Miller testified that he believed he had reasonable suspicion to detain Defendant based on his knowledge of why Officer Gordon was at the Sea Mist Resort and based on Officer Gordon calling out Defendant's vehicle.

Corporal Miller stopped Defendant and asked him for his license, registration, and proof of insurance. Corporal Miller relayed this information to dispatch, and while he was waiting for a response, asked Defendant to step out of the vehicle for questioning. Defendant explained that he was staying at the Sea Mist Resort while in Myrtle Beach doing hurricane relief work. Corporal Miller asked the Defendant for consent to search his vehicle, and Defendant declined. Corporal Miller then returned to his patrol car and radioed that he needed a drug dog at the scene because he could not get into Defendant's vehicle. While waiting on the canine, Corporal Miller started to write Defendant a ticket. He finished writing the ticket and running Defendant's information through dispatch before the canine officer arrived at the scene.

When the canine officer arrived, she walked her dog around the vehicle. It is not entirely clear from the video's angle, but it appears that the dog alerted on the driver's side of Defendant's vehicle. Officers searched Defendant's vehicle and found a variety of drugs and firearms, which resulted in Defendant's arrest.

## APPLICABLE LAW

### Fourth Amendment and Traffic Stops

"The Fourth Amendment provides in relevant part that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *United States v. Jones*, 565 U.S. 400, 404 (2012) (quoting U.S. Const. amend. IV). "Time and again, [the Supreme] Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (internal quotation marks omitted). "The exclusionary rule 'generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights." *United States v. Stephens*, 764 F.3d 327, 335 (4th Cir. 2014) (quoting *Penn. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 359 (1998)). The purpose of the exclusionary rule "is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–37 (2011).

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517

U.S. 806, 809–10 (1996) (citations omitted).  "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."  *Id.* at 810.  "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe a traffic violation has occurred."  *Id.* (citations omitted).  Thus, "[o]bserving a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop."  *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008).

"[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."  *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977).  Officers may then conduct unrelated investigations by questioning the driver or passengers.  *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) ("An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop.").  A traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission" of performing the necessary checks on the driver and issuing a warning or ticket.  *Illinois v. Caballes*, 543 U.S. 405, 406 (2005); *see also Branch*, 537 F.3d at 335 ("[P]ursuant to such a stop, a police officer may 'request a driver's license and vehicle registration, run a computer check, and issue a citation.'" (quoting *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004)).

The goal of pretextual traffic stops is simple.  It is to find a constitutionally permissible way to search the vehicle.  While the Supreme Court has held that officers

do not need a warrant to search a vehicle for contraband, they must have probable cause that the vehicle contains contraband. *See California v. Carney*, 471 U.S. 386, 390 (1985) (recognizing the automobile exception to the Fourth Amendment's warrant requirement); *see also Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more." (citing *Carney*, 471 U.S. at 393)). Often during traffic stops, law enforcement will observe contraband in plain view the vehicle, which provides probable cause for a search. *United States v. Green*, 599 F.3d 360, 376 (4th Cir. 2010). Other times, the driver may consent to a search of the vehicle. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

When neither of these situations applies, there are still means by which law enforcement can develop probable cause. For example, "[a] canine sniff is . . . constitutionally acceptable if performed within 'the time reasonably required' to issue a traffic citation." *Branch*, 537 F.3d at 335 (quoting *Illinois v. Caballes*, 543 U.S. 405 (2005)). "This is because a dog sniff is not a search within the meaning of the Fourth Amendment, and it therefore requires no additional justification." *Id.* at 335–36 (citations omitted). The timing of the canine sniff, however, is critical when evaluating the propriety of a search during a traffic stop. This issue was most recently addressed by the Supreme Court in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015).

In *Rodriguez*, the Supreme Court "granted certiorari to resolve a division among lower courts on the question whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." 135 S. Ct. at 1614. The Court first outlined the "mission" of a traffic stop—"to address

the traffic violation that warranted the stop and to attend to related safety concerns." *Id.* (internal citations omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Id.* at 1615 (quoting *Caballes*, 543 U.S. at 408). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citations omitted). The Court noted "[a] dog sniff, by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000). The Court thus determined that "a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* Because of this, the Court held that law enforcement *may not* extend an otherwise-completed traffic stop to conduct a dog sniff absent reasonable suspicion. *Id.* at 1616–17 (remanding the case to the Eighth Circuit Court of Appeals for a determination of whether officers had reasonable suspicion to detain Mr. Rodriguez beyond completion of the traffic infraction investigation).

### *Reasonable Suspicion*

"The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Courts have struggled to neatly define the concept of reasonable suspicion, "[b]ut the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). "Based upon that whole picture the detaining officers must have a particularized and objective basis for

suspecting the particular person stopped of criminal activity." *Id.* at 417–18 (citations omitted). "[T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* at 418; *see also United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) ("Reasonable suspicion is a commonsensical proposition. Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street."). Indeed, "[r]easonable suspicion is a commonsense, nontechnical standard that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018) (internal quotations and citations omitted). "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v. Ohio*, 392 U.S. 1, 27 (1968) (citation omitted).

### *Fourth Circuit Jurisprudence*

In recent years, the Fourth Circuit has addressed the issue of reasonable suspicion in the context of traffic stops in several opinions. A brief overview of several of these opinions follows.

<u>United States v. Foreman (2003)</u>

In *United States v. Foreman*, 369 F.3d 776 (4th Cir. 2003), the defendant was stopped early one morning by a Virginia State Police Trooper who was working a narcotics interdiction assignment on the highway. The Trooper observed the defendant in a "tense posture" driving a vehicle while "holding the steering wheel with both hands

and staring straight ahead as he passed [the Trooper] on Route 13." *Id.* at 778. The Trooper observed two traffic violations—(1) driving at an excessive speed and (2) obstruction of the defendant's view by several air fresheners—and pulled the defendant over. *Id.* When the Trooper approached the vehicle, he observed the defendant's "pulse beating through his shirt, his hands visibly shaking, and the carotid artery on his neck throbbing more noticeably than the 'thousands of people' that [the Trooper] had stopped in the past. *Id.* Additionally, the Trooper observed a "fold of currency" in the center console but saw no luggage in the vehicle. *Id.* at 778–79.

The Trooper checked the defendant's driver's license and had the defendant sit in the passenger's seat of the Trooper's vehicle. *Id.* at 779. While the Trooper waited for the license check to come back, another officer arrived with a drug dog and the Trooper began to question the defendant about his trip. *Id.* The defendant responded that he was returning from a one-day trip to New York City where he helped his brother, who had recently been evicted from his home. *Id.* The Trooper spoke to the defendant about the problem of gun and drug smuggling on the highway and "observed that [the defendant's] breathing became heavier and the pulsating of his carotid artery became more obvious." *Id.*

The defendant's license check came back clean, and the Trooper gave him a verbal warning. *Id.* The Trooper and the defendant exchanged a sweaty handshake and, though the defendant was free to leave, the Trooper asked the defendant if he could ask a few more questions, and the defendant agreed. *Id.* However, the defendant declined the Trooper's request for consent to search the vehicle. *Id.* The Trooper then had his colleague walk the drug dog around the vehicle, and the dog alerted to the

exterior of the vehicle. *Id.* at 780. Officers searched the vehicle, found $800 in cash, one kilogram of cocaine, and 10.5 grams of cocaine base, and the defendant was arrested. *Id.*

The defendant was indicted and moved to suppress the evidence obtained during the search of his vehicle. *Id.* at 780–82. The district court found that the initial stop ended once the Trooper and the defendant shook hands and held that the Trooper seized the defendant for a second time when the dog sniff was conducted. *Id.* at 782. Because of this, the district court held that the Trooper "was not entitled to rely on any factors tending to show reasonable suspicion that occurred prior to the termination of the traffic stop" and found that the Trooper needed to obtain consent or "additional suspicion" to justify the second seizure. *Id.*

On appellate review, the Fourth Circuit first held that the district court's finding that the Trooper could not consider any of the suspicion obtained prior to the termination of the traffic stop was erroneous. *Id.* Instead, the Fourth Circuit held that the termination of the traffic stop did not negate any then-existing reasonable suspicion. *Id.* Turning to the more fundamental question of whether the Trooper had reasonable suspicion to order the drug dog sniff, the Fourth Circuit held that the following factors, when considered together, justified a finding of reasonable suspicion: (1) the defendant's unusual explanation of his one-day trip to New York City, a major drug source city; (2) the defendant's tense posture while driving; (3) physical signs of extreme nervousness, which grew worse when the Trooper brought up drug smuggling on Route 13; (4) multiple air fresheners in the vehicle, which are often used to mask the smell of narcotics; and (5) the Trooper's experience and knowledge that drugs were frequently

trafficked to Virginia from New York City by Route 13. *Id.* at 784. The Fourth Circuit noted that these "factors cited by the United States eliminate a substantial portion of innocent travelers and, therefore, amount to reasonable suspicion that [the defendant] was engaged in drug trafficking." *Id.* at 785.

Judge Gregory filed a lengthy dissent,[2] in which he noted that he would have "remand[ed] this case for plenary consideration of the issue of reasonable articulable suspicion." *Id.* at 789 (Gregory, J., dissenting). Judge Gregory noted that the district court made several findings that cast doubt on the credibility of the Trooper. *Id.* at 790 (Gregory, J., dissenting). Judge Gregory then engaged in a discussion that rebutted the emphasis placed on the Government's articulated factors such as nervousness, New York being a "source city," and the presence of air fresheners. *See id.* at 790–96 (Gregory, J., dissenting). When considered together, Judge Gregory dismissed these otherwise innocuous factors as "little more than a blanket generalization about the nature of certain crimes that fails to provide the specificity which is the hallmark of the Fourth Amendment." *Id.* at 797 (Gregory, J., dissenting).

United States v. McCoy (2008)

Several years later, the Fourth Circuit addressed the issue of reasonable suspicion in the context of a stop and frisk in *United States v. McCoy*, 513 F.3d 405 (4th Cir. 2008). In *McCoy*, an investigator setup a surveillance of a grocery store parking lot to observe a controlled buy of narcotics unrelated to the defendant's case. *Id.* at 407. While staking out the parking lot, the investigator observed a man drive through the

_____

[2] Judge Gregory concurred in part with the majority's determination that the district court erred by analyzing the Trooper's interactions with the defendant as two separate incidents. *Id.* at 788–89 (Gregory, J., dissenting)

parking lot and park a vehicle in a parking space next to his patrol car. *Id.* at 407–08. The vehicle was occupied by the defendant and his girlfriend. *Id.* at 408. The investigator observed a tow-truck pull in a few minutes later in front of his vehicle, in a position close enough to the defendant so that they could communicate. *Id.* The tow-truck driver asked the defendant where he wanted to meet, and the defendant pointed in a southerly direction. *Id.* This piqued the investigator's attention and suggested to him that a drug deal might be occurring. *Id.* The two vehicles then left the parking lot, heading south, and the investigator radioed his colleagues who were involved in the unrelated controlled buy to let them know that he was going to follow the vehicles. *Id.*

The investigator followed the vehicles to another grocery store parking lot about a quarter mile away. *Id.* He had been involved in drug busts in this parking lot, and he watched the two vehicles park in the right corner of the lot five to eight parking spots apart. *Id.* Although it was early in the evening, the parking lot was only half full and "there were numerous available spaces between the store and the places where [the defendant] and the tow-truck driver decided to park their vehicles." *Id.* The investigator parked two rows behind the tow-truck and watched the defendant get out of his vehicle and enter the passenger's side of the tow-truck. *Id.* He stated that defendant and the tow-truck driver appeared to talk, although he could not see much of what was occurring. *Id.* After only a minute, the defendant exited the tow-truck and began walking back to his car while the tow-truck driver drove away. *Id.* "At this point, it was clear to [the investigator] that the tow-truck driver had not visited the parking lots for the purpose of performing towing services. [The investigator's] suspicion was particularly aroused because the vehicles had been to two grocery stores within a quarter mile of

each other and no one had gone into a grocery store." *Id.* (internal quotation marks omitted).

Believing that a drug deal had just occurred, the investigator radioed the patrol units back at the other grocery store lot, exited his vehicle, and walked toward the defendant and asked to speak to him. *Id.* The investigator whistled at the tow-truck driver and told him to park the truck. *Id.* In response, the tow-truck driver sped away. *Id.* The investigator informed the defendant that he was a police officer and told him to put his hands on his vehicle so that he could frisk him. *Id.* The defendant tried to comply but then pulled his hands away from the vehicle several times, requiring the investigator to place him in handcuffs. *Id.* The investigator then frisked the defendant and found a pocketknife. *Id.* at 408–09. The investigator then spoke to the defendant's girlfriend, who stated that she believed the defendant just engaged in a drug deal and consented to a search of the vehicle. *Id.* at 409. The investigator found marijuana and cash in the vehicle. *Id.* The defendant gave a post-*Miranda*[3] confession. *Id.*

The defendant was indicted and moved to suppress the evidence uncovered by the investigator during his detention and frisk, arguing that the investigator lacked reasonable, articulable suspicion to conduct a *Terry*[4] stop and frisk. *Id.* The district court held a suppression hearing and granted the defendant's motion to suppress evidence obtained by the investigator on the evening of the arrest. *Id.* at 409–10. The Government appealed, contending that the investigator had reasonable, articulable suspicion to stop and frisk the defendant. *Id.* at 410.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

On appeal, the Fourth Circuit first noted that "[a]lthough the [district] court recounted what [the investigator] *had* observed and what he knew at the time he frisked [the defendant], it focused its reasonable suspicion analysis on what [the investigator] *had not* observed and what facts *were not* present." *Id.* at 412. For example, the Fourth Circuit noted that the district court reasoned that the two grocery store parking lots were not high crime areas, the investigator did not hear the defendant's conversation with the tow-truck driver, the investigator observed no furtive movements by the defendant, the investigator observed no hand-to-hand drug transaction, and the investigator had no knowledge that either individual was involved in drugs. *Id.* In response, the Fourth Circuit looked at what facts did exist in the case, and rejected the district court's conclusion that the investigator's detention and pat down of the defendant was based merely on a hunch. *Id.*

To that end, the Fourth Circuit noted the following factual circumstances known to the investigator: (1) nearly 50% of the drug deals in the county occur in public parking lots; (2) both grocery store parking lots were often meeting places for drug deals; (3) drug dealers often engage in counter-surveillance techniques, including changing the location of the drug deal; (4) the investigator observed the defendant and his girlfriend drive into the first parking lot and sit in the car for several minutes; (5) after the tow-truck driver asked defendant where he wanted to meet, the defendant pointed in a southerly direction; (6) the tow-truck driver and the defendant then headed south to another grocery store parking lot about a quarter mile away and did not go into the store; (7) the investigator observed the defendant enter the cab of the tow-truck and then exit after only a minute; (8) the tow-truck performed no towing services and began to leave before

the investigator reached the defendant; and (9) when the investigator whistled for the tow-truck driver to stop, the driver responded by driving away at a high rate of speed. *Id.* at 413.  Evaluating the totality of the circumstances, the Fourth Circuit held that the investigator's articulated facts served to eliminate a substantial portion of innocent travelers and constituted reasonable suspicion.[5]  *Id.*

Judge Gregory filed a dissenting opinion, which asserted that "the majority opinion exploits subjective experience [of the investigator] to trump an otherwise absence of reasonable suspicion."  *Id.* at 416 (Gregory, J., dissenting).  Unlike the majority's characterization of the events leading to the defendant's arrest, Judge Gregory characterized the sequence of events as "only two individuals having a conversation in broad daylight, following each other from one public location to another, and continuing their conversation."  *Id.* at 417 (Gregory, J., dissenting).  Judge Gregory also noted that the defendant "did nothing more than communicate and associate in a public place."  *Id.* Put differently, Judge Gregory contended that the defendant's "conduct does not eliminate a substantial portion of innocent ordinary activity."[6]  *Id.*

United States v. Williams (2015)

In 2015, the Fourth Circuit issued *United States v. Williams*, 808 F.3d 238 (4th Cir. 2015), in which it reversed the denial of a motion to suppress by finding that police

---

[5] Judge Wilson filed a concurring opinion, which agreed with the majority's conclusion, but placed special emphasis on the tow-truck driver's flight from the scene of the alleged drug deal.  *See id.* at 415–16 (Wilson, J., concurring).

[6] Following *McCoy*, the Fourth Circuit issued several similar split decisions addressing the issue of reasonable suspicion.  *See, e.g.*, *United States v. Branch*, 537 F.3d 328 (4th Cir. 2008) (finding reasonable suspicion over the dissent of Judge Gregory); *United States v. Mason*, 628 F.3d 123 (4th Cir. 2010) (finding reasonable suspicion over the dissent of Judge Gregory).

officers did not have reasonable, articulable suspicion of criminal activity. In *Williams*, Deputies Russell and Soles observed two vehicles travelling close together on a North Carolina interstate late at night. *Id.* at 241. Deputy Soles stopped the lead vehicle, which was driven by the defendant's brother, and Deputy Russell stopped the second vehicle, which was a rental car driven by the defendant with his girlfriend in the front passenger's seat. *Id.* Deputy Russell informed the defendant that he was traveling ten miles per hour over the speed limit and requested the defendant's license and registration. *Id.* The defendant produced a New York license and a vehicle rental agreement. *Id.* The rental agreement reflected that the defendant's brother had rented the car from a Hertz in New Jersey three days earlier and was to be returned on the afternoon of the traffic stop. *Id.* Deputy Russell asked the defendant to exit the vehicle and sit in his patrol car while he checked the documents. *Id.* at 242. The defendant complied, and his girlfriend remained in the vehicle. *Id.*

While the defendant was in the patrol car, Deputy Russell engaged him in conversation. *Id.* The defendant stated that he and his girlfriend had stopped at his mother's home in Virginia Beach and were travelling to Charlotte to visit his brother for a couple days. *Id.* Deputy Russell thought he smelled alcohol and asked the defendant if he had been drinking. *Id.* The defendant stated that he had consumed a beer with supper, and Deputy Russell asked Deputy Soles to conduct a breathalyzer test on the defendant. *Id.* As a result of this, Deputy Soles gave the defendant's brother a verbal warning and let his vehicle leave the scene to accommodate Deputy Russell's request for a breathalyzer. *Id.* While Deputy Soles was conducting the breathalyzer test, Deputy Russell approached the defendant's vehicle and asked the defendant's girlfriend

about their travel plans and the defendant's alcohol consumption.  *Id.*  She responded that the defendant had very little to drink and that they were going to Charlotte on vacation.  *Id.*

The defendant passed the breathalyzer test, and Deputy Russell informed the defendant that he would be issuing him a warning ticket for speeding.  *Id.*  Yet when Deputy Russell asked the defendant for an address to complete the written warning, the defendant gave him the post office box address of his place of employment, which differed from the New York post office box address on his driver's license.  *Id.*  Deputy Russell continued writing the warning ticket while Deputy Soles asked the defendant additional questions about his residence, where he was heading, and how he was going to handle the expiration of his rental agreement that afternoon.  *Id.*  Deputy Russell gave the defendant the warning ticket and, seconds later, asked the defendant, "Nothing illegal in the car?"  *Id.* at 243.  The defendant responded that there was not, but Deputy Russell "persisted—again asking [the defendant] if he could search the [vehicle]."  *Id.*  Although the defendant initially equivocated, he eventually told officers that they could not search the vehicle.  *Id.*  Then—one minute and twenty-three seconds after Deputy Russell issued the warning ticket—Deputy Soles told the defendant to "hold on" because he was going to conduct a dog sniff of the vehicle with his drug dog.  *Id.*  The deputies removed the defendant's girlfriend from the car, and the drug dog "alerted at the driver's side of the trunk after completing a full circle of the vehicle."  *Id.*  The alert occurred two minutes and forty seconds after Deputy Soles instructed the defendant to "hold on" while he conducted the dog sniff.  *Id.*  The deputies found crack cocaine in an unlocked safe in the vehicle's trunk, and the defendant was arrested.  *Id.*

The defendant was indicted for drug violations and moved to suppress the evidence obtained during the search of his vehicle. *Id.* at 241. The district court denied the motion, and the defendant appealed. *Id.* The district court rested its holding on five factors set forth by the Government: (1) the defendant was traveling in a rental car; (2) the defendant was traveling on a known drug corridor at 12:37 a.m.; (3) the defendant's stated travel plans were inconsistent with, and would likely exceed, the due date for return of the rental car; (4) the defendant was unable to provide a permanent home address in New York even though he claimed to reside there at least part time and had a New York drivers' license; and (5) the defendant stated that he was traveling with the vehicle ahead of him, though that car's driver denied any association with the defendant. *Id.* (quotations omitted). Alternatively, the district court "ruled that the two-minute-and-forty-second extension for the dog sniff fell within the general parameters of a *de minimis* delay that does not offend the Fourth Amendment." *Id.* (quotation omitted). Following this ruling, the Government provided the defendant with the video of Deputy Soles stop of the lead vehicle, which "directly contradicted Deputy Soles's evidence at the initial hearing on the fifth factor identified in the [suppression order]." *Id.* The defendant moved for reconsideration, and the district court held another hearing where Deputy Soles acknowledged that his testimony about the defendant's brother denying any association with the defendant was wrong and that he had made a mistake. *Id.* at 244. The district court issued a superseding order, in which it noted Deputy Soles's untruthful testimony and the Government's *Brady*[7] violation; however, the district court

---

[7] *Brady v. Maryland*, 373 U.S. 83 (1963).

again denied the suppression motion, relying on the other four factors set forth in the initial order.[8] *Id.*

The defendant appealed, contending "that the deputies lacked the reasonable suspicion necessary to extend the traffic stop beyond its initial purpose." *Id.* at 245. On appeal, the Government "concede[d] that the *de minimis* ground for denying the suppression motions [was] legally untenable."[9] *Id.* Judge King, writing for a unanimous Fourth Circuit panel, analyzed each of the four factors that the district court relied upon. *See id.* at 247–53. Evaluating each factor individually and collectively, the Fourth Circuit held: (1) the deputies explained no connection between rental cars and criminal activity, and it is "beyond peradventure . . . that the overwhelming majority of rental car drivers on our nation's highways are innocent travelers with entirely legitimate purposes"; (2) "[s]imilar to traveling in a rental car . . . the number of persons using the interstate highways as drug corridors pales in comparison to the number of innocent travelers on those roads" and found unpersuasive the Government's "proposition that traveling south on I-85 late at night helps narrow the identification of travelers to those involved in drug activity" because "there is nothing inherently suspicious about driving at night on an interstate highway"; (3) Deputy Russell "failed to explain how the rental car's due date was suspicious" because the defendant "replied promptly [to the deputies' questioning] that he and [his girlfriend] would renew the rental agreement in Charlotte," which was a plausible explanation because Hertz is "a well-known car rental business

---

[8] The district court again ruled in the alternative that the dog sniff constituted only a *de minimis* delay that did not offend the Fourth Amendment.

[9] The Supreme Court of the United States decided *Rodriguez* during the pendency of the defendant's appeal. *Id.*

with locations most everywhere"; and (4) the deputies' contention that the defendant failed to give them his home address was unsupported by the record because the defendant was not specifically asked that question and the deputies "failed to develop the fourth factor with [the defendant] during the traffic stop and offered no explanation of how that factor contributed to any reasonable suspicion." *Id.* at 247–51. Relying on several similar cases,[10] the Fourth Circuit determined that the district court's four articulated factors "fail to eliminate a substantial portion of innocent travelers" and vacated and remanded the district court's decision. *Id.* at 253.

United States v. Bowman (2018)

Most recently, the Fourth Circuit issued a published decision in *United States v. Bowman*, 884 F.3d 200 (4th Cir. 2018), which is particularly instructive to this case. In *Bowman*, a Trooper with the North Carolina State Highway Patrol's Criminal Interdiction Unit who was patrolling a stretch of highway early one morning "received a tip from the Drug Enforcement Agency ["DEA"] that two individuals suspected of transporting methamphetamine from Atlanta to the Asheville and Hendersonville areas were possibly driving a red, older model Lexus in the area." *Id.* at 205 (quotation omitted). The DEA provided the Trooper with the license plate number for the vehicle, and, at about 3:40

---

[10] *See, e.g., United States v. Digiovanni*, 650 F.3d 498, 512 (4th Cir. 2011), *abrogated on other grounds by Rodriguez v. United States*, 135 S. Ct. 1609 (2015) (finding that officers did not have reasonable suspicion to extend a traffic stop despite the Government's ten articulated factors, which included, *among other things*, nervousness, a rental car, traveling on a known drug corridor from a source city, and various other seemingly innocuous factors); *see also United States v. Boyce*, 351 F.3d 1102 (11th Cir. 2003) (finding that officers did not have reasonable suspicion to extend a traffic stop when the video of the traffic stop belied several of the Government's articulated factors, including nervousness and talkativeness, and the defendant explained his unusual traffic plans).

a.m., the Trooper spotted a red Lexus travelling on the highway and began following the vehicle in order to look for a traffic infraction. *Id.* The Trooper observed the vehicle weave over the fog line and begin speeding, which suggested to the Trooper that the driver might be under the influence of alcohol or drugs. *Id.*

The Trooper initiated a traffic stop and approached the Lexus from the passenger side, observing the defendant in the driver's seat and a male passenger. *Id.* The Trooper later noted that the defendant appeared to be nervous because his hands were shaking when he handed over his license and registration and the passenger was staring straight ahead rather than making eye contact. *Id.* Additionally, the Trooper testified that he saw movement in both men's carotid arteries, which led him to conclude that both men had elevated heart rates and were nervous. *Id.* The Trooper acknowledged that he saw no alcohol or firearms in the vehicle; however, he "took note of several items in [the defendant's] car, including an energy drink in the front seat console, food and food wrappers in the front seat, and a suitcase and loose items of clothing in the back seat." *Id.* According to the Trooper, the presence of those items suggested that the pair could have been travelling for a long period of time in a hurry to get from one location to another without stopping to rest or have meals. *Id.* at 205–06.

The Trooper asked the defendant to exit the vehicle and go to the patrol car for a check of his information. *Id.* at 206. The defendant consented to a weapons frisk, and the Trooper found none. *Id.* The Trooper did, however, observe the passenger moving around in the front of the vehicle and look backwards towards the Trooper and the defendant. *Id.* This was another indication of nervousness, according to the Trooper. *Id.* While the Trooper was running the defendant's information, the defendant

apologized for speeding and stated that he thought he was not exceeding the speed limit, stated that he was tired, and sought to explain away the weaving by stating he recently purchased the vehicle and was having issues with the front end. *Id.*

The Trooper began to question the defendant about his whereabouts, and the defendant responded that he was heading home after picking up the passenger at his girlfriend's house twenty-five to thirty minutes earlier. *Id.* Although the defendant did not know the girlfriend's address, he told the Trooper that he had entered it into the GPS in the vehicle. *Id.* The Trooper asked the defendant what he did for a living, and the defendant responded that he was a welder and fabricator but was now laid off of work. *Id.* Finally, the Trooper asked the defendant if he had any prior speeding tickets, and the defendant acknowledged having one prior ticket while using a different vehicle that he had purchased off of Craigslist. *Id.* This seemed suspicious to the Trooper because narcotics traffickers often use multiple, different vehicles or rental vehicles to traffic narcotics and because it would be unlikely that the defendant could purchase multiple vehicles while he was laid off. *Id.* The Trooper was convinced that the defendant was not intoxicated, so he issued a warning for speeding and unsafe movement of the vehicle, returned the defendant's license and registration, and shook the defendant's hand. *Id.*

Despite the conclusion of the traffic stop, the Trooper asked the defendant if he could ask a few more questions, and the defendant assented. *Id.* at 207. The Trooper inquired further about the defendant's travel plans and the identity of his passenger's girlfriend, but the defendant gave equivocal or nonresponsive answers. *Id.* The Trooper then told the defendant to stay in the patrol car, and later testified that the

defendant was not free to leave because he had developed reasonable suspicion from the traffic stop alone (i.e., without the DEA tip). *Id.* The passenger gave the Trooper an inconsistent story, telling the Trooper that they had been visiting friends in Georgia. *Id.* The Trooper asked the defendant if there was any methamphetamine in the vehicle, and the defendant responded in the negative and refused the Trooper's request for consent to search the vehicle. *Id.* The Trooper then removed the passenger from the vehicle, frisked him for weapons, put him in the patrol car, and summoned a canine officer to conduct a sniff on the exterior and interior of the vehicle. *Id.* The dog alerted, and officers found methamphetamine, scales, and containers of ammunition in the vehicle. *Id.*

The defendant was indicted and moved to suppress the evidence recovered from the search of his car, arguing that the Trooper unlawfully prolonged the completed traffic stop without consent or reasonable suspicion. *Id.* The magistrate judge concluded that the prolonged detention was permissible, identifying several factors he believed collectively provided the Trooper with reasonable suspicion: (1) the nervousness of the defendant and the passenger; (2) the presence of items suggesting that the defendant was untruthful about how long he had been traveling, including a suitcase, loose clothes, energy drink, food, and food wrappers; (3) the defendant's inability to articulate where the passenger's girlfriend lived; (4) the defendant's statement that he recently purchased the vehicle despite being laid off; and (5) the defendant's statement that he bought cheap cars on Craigslist, which is similar to known practices of drug traffickers. *Id.* at 208. The district court adopted the magistrate judge's recommendation, and the defendant entered a conditional guilty plea. *Id.* at 208–09.

The defendant appealed, contending that the Trooper did not have reasonable suspicion sufficient to extend the traffic stop. *Id.* at 209. Judge Traxler, writing for a unanimous panel, first determined that the Trooper completed the stop when he issued a warning ticket. *Id.* at 210. However, the defendant consented to additional questioning for a very short period of time, prior to the Trooper telling the defendant to "hang tight" in the vehicle. *Id.* In fact, the Trooper later testified that the defendant was not free to leave at that point, and the Fourth Circuit determined that "a reasonable person would have understood that he was no longer free to terminate the exchange." *Id.* at 212. Having determined that the defendant did not consent to the prolongation of the traffic stop, the Fourth Circuit turned to whether the Trooper had reasonable suspicion to prolong the traffic stop. *Id.* at 213.

The Fourth Circuit first addressed each individual factor identified by the district court at length, and concluded that each factor on its own was primarily innocuous and not reasonably connected to criminal activity. *See id.* at 214–15 (nervousness); 216 (clothes, food, and energy drink in the vehicle); 216–17 (uncertainty about the passenger's girlfriend's address); 217–18 (vehicle purchases); 218 (drug traffickers using multiple vehicles). Thus, the Fourth Circuit determined "[s]tanding alone, none of the foregoing factors provides a basis for a reasonable, articulable suspicion that [the defendant] was engaged in criminal activity." *Id.* at 218. Turning to the totality of the circumstances, the Fourth Circuit found:

> The fact that [the defendant] was driving a messy, 18-year-old car he purchased on Craigslist, even when viewed with all the other circumstances, is not indicative of criminal activity. [The Trooper's] law enforcement experience that drug traffickers use multiple, different vehicles to transport narcotics also does not aid the government, as nothing in the record supports the notion that [the defendant] was using

*multiple* cars simultaneously. The fact that [the defendant] appeared to be nervous initially adds little, given that law-abiding drivers commonly experience nervousness during a traffic stop. And, even combined with all of the other circumstances, [the defendant's] alleged evasiveness about the where (sic) he had picked up [the passenger] likewise would not tip the balance in favor of reasonable suspicion given that [the defendant] told [the Trooper] he was not familiar with the area but that [the Trooper] could see the location by looking at [the defendant's] GPS unit.

*Id.* (internal quotations and citations omitted). In conclusion, the Fourth Circuit held that "[a]lthough the nature of the totality-of-the-circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation. The government has failed to identify any such concrete reasons." *Id.* at 219

As these cases make clear, resolving whether an officer had reasonable suspicion is fact-intensive and subject to frequent disagreement. However, the cases show a recent trend towards more scrupulous examination of the Government's articulated reasons for suspecting criminal activity. The Court turns now to the case at bar.

## DISCUSSION

The Court must first determine whether Corporal Miller prolonged the traffic stop longer than was reasonably necessary to accomplish the "mission" of the stop. After reviewing the videos and testimony from the suppression hearing, the Court finds that Corporal Miller actually finished writing Defendant a ticket and conducting the necessary license, registration, and warrant checks several minutes prior to the arrival of the canine unit. Accordingly, the Court holds that Corporal Miller did prolong the traffic stop in order to conduct a canine sniff. Thus, the dispositive question here is whether Corporal Miller had reasonable suspicion to justify the extension of the traffic stop. As

detailed below, the Court acknowledges that this is a very close question in light of recent appellate case law. Even so, viewing the totality of the circumstances, the Court concludes that Corporal Miller did not have reasonable suspicion to continue his seizure of Defendant.

In its brief, the Government states, "[Officer] Gordon saw [Defendant] leave the apartment or unit where all of the runners were going both before and after the drug transactions." ECF No. 50 at 5. However, at the hearing, Officer Gordon's testimony was far more equivocal. As previously stated, Officer Gordon testified that he set up a position across the street from the Sea Mist Resort so that he could observe hand-to-hand drug transactions and relay that information to his colleagues. Officer Gordon testified that he observed Defendant and another individual "at a room where [he] saw the runners come and go from," and that he then observed Defendant and the other individual talk to the runners who were hanging out in front of the room. On cross-examination, Officer Gordon testified that he saw Defendant in the area of the runners and testified that Defendant "appeared to come from the room that [the runners] were coming and going from." The Court asked Officer Gordon to clarify whether he saw Defendant come out of the room or come from the area of the entrance of the room. Officer Gordon first clarified that he was not directly facing the rooms and was, instead, looking straight down the wall of the hallway. Then, Officer Gordon responded, "[h]e appeared to be coming from the same place [the runners] had been coming and going from."

After reviewing Officer Gordon's testimony, the Court remains unclear about exactly what Officer Gordon observed. At times Officer Gordon testified that he thought he saw

Defendant leave the room being surveilled. At other times Officer Gordon testified that he saw Defendant in the vicinity of the door of the room. There was certainly no testimony about how long Defendant was in the room (if at all). Perhaps the lack of clarity in Officer Gordon's testimony is attributable to the length of time since Defendant's arrest. This temporal limitation is likely exacerbated by the lack of any police report documenting Officer Gordon's observations. Indeed, Officer Gordon testified that he did not write a police report outlining the details of his observations on the evening of Defendant's arrest. Similarly, Corporal Miller testified that, while he did write a police report, it did not include any operational details from Officer Gordon's observations at the Sea Mist Resort.[11]

Corporal Miller acknowledged during his testimony that he smelled no marijuana emanating from Defendant's car, that Defendant did not appear nervous, and that Defendant did not lie and was not evasive during the traffic stop. Indeed, in many cases, officers go to great lengths to articulate innocuous facts to bolster an apparent finding of reasonable suspicion. *See, e.g., United States v. Digiovanni*, 650 F.3d 498, 512 (4th Cir. 2011), *abrogated on other grounds by Rodriguez v. United States*, 135 S. Ct. 1609 (2015) (finding that the Government's reliance on presence of two hanging shirts in the rear passenger compartment of a vehicle "borders on the absurd"). To

---

[11] Corporal Miller testified that he omitted the operational details from his report because "[t]hese days about everything is [FOIA-able]." *See* Tr. 26 (the Court notes that it appears the transcript contains a typographical error and reads, "These days about everything is forwardable"). The Court understands this testimony to mean that Corporal Miller did not want the public to be able to learn about the tactical strategies used by Horry County Police Department's drug enforcement officers. The Court notes that the South Carolina Freedom of Information Act has exemptions that may permit withholding information about proprietary investigative techniques. *See, e.g.*, S.C. Code Ann. § 30-4-40(a)(3). As a result, it is unclear why officers would omit such critical information from Defendant's police report.

Corporal Miller's credit, he testified candidly that there was nothing during the traffic stop that added anything to the reasonable suspicion calculus.

Moreover, Defendant explained during the traffic stop that he was staying at the Sea Mist Resort while working in the Myrtle Beach area doing hurricane relief. Thus, Defendant had an entirely plausible explanation for his presence at the hotel. This further supported an inference that Defendant was staying at the hotel for an extended period of time, which would not make it unusual for him to speak to other residents at the hotel.[12] Put differently, there were no inconsistencies in the answers that Defendant gave Corporal Miller during the traffic stop. *Cf. United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997) (noting that "inconsistencies in information provided to the officer during the traffic stop may give rise to reasonable suspicion of criminal activity," but holding that, when a defendant corrects his error, "suspicious inconsistencies virtually evaporated and any justification his error yielded for further investigation dissipated").

That leaves Defendant's presence in the area of the hotel room from which apparent drug activity was observed and his interaction with individuals likely involved in such drug trade as the sole basis for Corporal Miller's extension of the traffic stop. While the Fourth Circuit has held that "an area's propensity toward criminal activity is something that an officer may consider" when evaluating reasonable suspicion, it has emphasized that "the defendant's mere presence in a high crime area is not by itself enough to raise reasonable suspicion." *See United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) (finding reasonable suspicion based on the defendant's presence in an area known for

---

[12] In fact, Defendant was a registered guest at the Sea Mist Resort, with a room registered in his name. Although the Court does not factor this into its reasonable suspicion analysis, the Court does note that Defendant's explanation was plausible and that Corporal Miller did not inquire further or attempt to have Defendant verify his story.

drug traffic when the defendant was observed conducting a suspected drug transaction with several other individuals late at night); *see also United States v. Perrin*, 45 F.3d 869 (4th Cir. 1995) ("Were we to treat the dangerousness of the neighborhood as an independent corroborating factor, we would be, in effect, holding a suspect accountable for factors wholly outside of his control.").

Under the facts here, Defendant's presence at the Sea Mist Resort and his interaction with the runners and an unknown male both have innocuous explanations. The Court must view this behavior through the lens of an experienced police officer who is familiar with drug investigations; however, even in the context of Officer Gordon's experience, Defendant's behavior here is also consistent with that of an innocent hotel guest, and the Court cannot say that Corporal Miller eliminated a substantial portion of innocent, ordinary activity when he made the decision to continue to detain Defendant. While Officer Gordon did observe a number of hand-to-hand drug transactions at the Sea Mist Resort, he did not observe Defendant participating in any of these transactions. Nor did he observe Defendant definitively enter or exit any room, much less the room where the drug runners were coming from. Instead, Officer Gordon merely observed Defendant in the vicinity of a high crime, open air drug market, conversing with other individuals in public. In this case, Defendant's interaction with individuals involved in the drug trade in a public place does not lead to a reasonable belief the he too is involved in the drug trade or other criminal activity. *See, e.g.*, *Bowman*, 884 F.3d at 219 ("[I]t is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such

an interpretation. The government has failed to identify any such concrete reasons." (internal quotation omitted)).

A recent case from the Fifth Circuit Court of Appeals is instructive and supports the Court's holding. In *United States v. Spears*, law enforcement was monitoring a house in Fort Worth, Texas for drug activity. 636 F. App'x 893, 895 (5th Cir. 2016). Law enforcement knew that a suspected drug dealer, Horacio Loera lived in the house, and officers had previously seized approximately 250 pounds of marijuana from a business owned by the drug dealer. *Id.* On two occasions, confidential informants ("CIs") purchased drugs from people associated with Loera, and on one occasion an undercover officer purchased drugs from a person who had very recently visited Loera's house. *Id.* After those buys, officers asked a CI to order cocaine from a different suspected drug dealer. *Id.* When the CI placed the order, the dealer said he would contact his source. *Id.* Officers conducted surveillance and observed the dealer travel to Loera's house and knock on the door, but nobody answered. *Id.* He then told the CI that he couldn't get ahold of his supplier and that he went by his supplier's house but nobody was home. *Id.* Based on this information, officers concluded that Loera was the supplier. *Id.*

The next morning, officers set up surveillance at Loera's house, and after about thirty minutes, Loera arrived at the house driving a silver sport utility vehicle. *Id.* A short time later, the defendant arrived at the house driving a white truck with an Oklahoma license plate. *Id.* Additionally, "[a] third, blue car either arrived near this same time or

was already parked in the driveway[13] when surveillance began." *Id.* The defendant backed his truck into the driveway towards the back of the house "in a manner that completely obstructed the driver's side and the passenger's side of the truck from the view of the officers on the street." *Id.* at 896. Therefore, officers "could not see whether [the defendant] exited his truck, entered or exited the house, or talked to Loera." *Id.* At the time, the defendant was unknown to officers and had not previously been linked to Loera's house or to any drug activity. *Id.*

After ten to twenty minutes, the defendant drove away from Loera's house, and an officer followed him. *Id.* "Five to ten minutes after [the defendant] left, a red car with Louisiana license plates arrived at [Loera's house]. Officers observed two men get out of the red car, meet with Loera in the front yard, go to the back of the house without carrying anything, return to the car carrying a duffle bag, and put the duffle bag in the trunk of the car." *Id.* Around five minutes later, the two men left, and officers followed them; additionally, Loera left and officers followed him. *Id.*

An officer pulled the defendant over after another officer witnessed him commit a traffic violation. *Id.* The officer observed the defendant rummaging around the center console of the truck, and he asked the defendant for his driver's license and proof of insurance, which the defendant provided. *Id.* The officer began questioning the defendant, who "appeared nervous, was not giving straight answers, was evasive in responding to questions, and was very non-compliant." *Id.* For example, the defendant stated that he was coming from visiting a relative, which the officer did not believe was true. *Id.* The officer asked the defendant for consent to search the vehicle, and the

---

[13] "The driveway extended all the way down the side of the house, behind the house, and into the backyard." *Id.* at 895–96.

defendant declined. *Id.* Another officer arrived, and the officers asked the defendant to step out of the truck. *Id.* He was initially non-compliant but eventually entered the back of the patrol car to wait for a drug dog to arrive. *Id.* Officers were unable to find a drug dog to come to the scene, even with help from agents from the DEA; however, the officers who stopped Loera found a vacuum-sealed bag of money in Loera's vehicle, and the officers detaining the defendant determined that this constituted probable cause to search the defendant's vehicle. *Id.* at 896–97. In their search, officers found a handgun, approximately $59,800 in cash, a counterfeit money detector, and a laundry bag that smelled like marijuana. *Id.* at 897. The defendant was arrested and transported to the local DEA office. *Id.*

The defendant was indicted and moved to suppress the evidence obtained as a result of the search and seizure. *Id.* "The district court denied the motion to suppress evidence, holding that law enforcement officers had probable cause to search [the defendant's] vehicle and that [the defendant's] detention pursuant to a traffic stop until there was probable cause for the search was reasonable." *Id.* The defendant was convicted and appealed. *Id.*

The Fifth Circuit addressed several Fourth Amendment issues relative to the traffic stop. On the issue of reasonable suspicion, the Government claimed the following facts created reasonable suspicion to pull over the defendant: (1) the defendant visited Loera's house, which was the site of an attempted drug transaction with a CI the day before, was where a suspected drug dealer lived, and was previously visited by a person very soon before that person sold drugs to an undercover officer; (2) the defendant backed his truck into the driveway in a manner that obstructed the driver's

side and the passenger's side of the truck from the view of the officers; (3) the defendant had an out-of-state license plate; (4) multiple vehicles arrived at Loera's house near the time the defendant arrived; and (5) the defendant stayed at Loera's house for only ten to twenty minutes." *Id.* at 899. The Fifth Circuit rejected the Government's argument, holding:

> Visiting a house linked to drug activity is similar to being in a high-crime area. While a person's presence in an area known to be high in crime is a relevant contextual consideration in the reasonable suspicion analysis, such presence, standing alone, is not enough to support a reasonable suspicion that anybody found there is involved with drugs. Likewise, the fact that [the defendant] visited [Loera's house], which was linked to drug activity in several ways, is relevant; however, this fact alone is not enough to support a reasonable suspicion that he is involved with drugs. Significantly, neither [the defendant] nor his truck were known to the officers before he visited [Loera's house], and he had not previously been identified as a suspect connected with drug activity, [Loera's house], or Loera. Also, the officers did not observe [the defendant] take any action besides parking in the driveway; specifically, they did not see [the defendant] exit his truck, enter or exit [Loera's house], or talk to Loera. Thus, the officers had no way of differentiating [the defendant] from a law-abiding visitor—for example, a maintenance technician visiting to work on the house, or a relative visiting for social purposes only. For these reasons, additional suspicious activity is needed to give rise to a reasonable suspicion that [the defendant] had committed or was about to commit a crime.

*Id.* Further, the Fifth Circuit later evaluated the remaining factors, such as, *inter alia*, the defendant's nervousness, a backpack inside the defendant's vehicle, and the defendant's alleged lie to officers during the traffic stop, and determined that "the totality of circumstances that existed both before the stop and during the initial sixteen and a

half minutes of the stop did not create a reasonable suspicion of criminal activity."[14]  *Id.* at 904.

The Court agrees with the reasoning of the *Spears* court and finds it particularly instructive in this case.  Officer Gordon and Corporal Miller based their reasonable suspicion finding solely on Defendant's presence near the hotel room at the Sea Mist Resort and Defendant's interaction with the runners and the unknown male driving the red Cadillac.  The Court finds that these facts, taken individually and collectively, are insufficient to constitute reasonable suspicion.  This decision is in accord with many other Courts, including several Fourth Circuit decisions detailed above, that find that an individual's presence in a high crime area simply does not establish reasonable suspicion.  The other incidental facts present here—including Defendant speaking to the runners and an unknown male—are innocuous and not demonstrably linked to any criminal activity *on the part of Defendant*.

The Court understands that law enforcement has a difficult and dangerous job, and commends Officer Gordon and Corporal Miller for their candor during the suppression hearing.  Often, drug interdiction efforts are fluid situations that require on-the-fly judgments by experienced police officers.  The Fourth Amendment, however, requires law enforcement to have more than a hunch to detain an individual after a traffic stop is completed.  Instead, officers must have objective, reasonable suspicion that the individual is involved in drug activity.  Under the totality of the circumstances, the Court holds that Officer Gordon and Corporal Miller's testimony does not rise to the level of

---

[14] The Fifth Circuit found that law enforcement was authorized to pull the defendant over based on the observation of a traffic violation, so it was necessary for the Court to also address whether reasonable suspicion existed to extend the traffic stop.  *Id.* at 899.

reasonable, articulable suspicion necessary to justify the detention of Defendant beyond the conclusion of the traffic stop. Thus, the Court must suppress the evidence seized during the search of Defendant's vehicle.

**CONCLUSION**

For these reasons, Defendant's Motion to Suppress, ECF No. 43, is **GRANTED**.

IT IS SO ORDERED.

s/ Donald C. Coggins, Jr.
United States District Judge

May 14, 2018
Spartanburg, South Carolina